# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs February 2, 2016

## STATE OF TENNESSEE v. MAURICE BLOCKER

### Appeal from the Criminal Court for Shelby County
### No. 12-03071     W. Mark Ward, Judge

### No. W2015-00053-CCA-R3-CD  -  Filed May 18, 2016

A Shelby County jury convicted the Defendant-Appellant, Maurice Blocker, as charged of one count of first degree premeditated murder and one count of theft of property valued at $1000 or more but less than $10,000. See T.C.A. §§ 39-13-202(a)(1); 39-14-103, -105(3) (Supp. 2011). Blocker[1] was sentenced to consecutive sentences of life imprisonment and eight years, respectively. His sole argument on appeal is that the evidence is insufficient to sustain his convictions. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and TIMOTHY L. EASTER, JJ., joined.

Stephen C. Bush, District Public Defender; Tony N. Brayton, Assistant Public Defender, Memphis, Tennessee (on appeal); and Amy G. Mayne, Robert H. Gowen, and Anna Benson, Assistant Public Defenders, Memphis, Tennessee (at trial) for the Defendant-Appellant, Maurice Blocker.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Patience R. Branham, and Glenda Adams, Assistant District Attorneys General, for the Appellee, State of Tennessee.

---

[1] We acknowledge that we do not use titles when referring to every witness. We intend no disrespect in doing so. Judge John Everett Williams believes that referring to witnesses without proper titles is disrespectful even though none is intended. He would prefer that every adult witness be referred to as Mr. or Mrs. or by his or her proper title.

# OPINION

**Trial.** The Defendant-Appellant, Maurice Blocker, and Laticia Bodie,[2] the victim, had a tumultuous relationship spanning several years. The victim told several individuals that she was "very afraid" of Blocker and was trying "to get away from him" shortly before her death.

During the late night hours of April 14, and the early morning hours of April 15, 2012, Jerome Nettles was watching a movie with his girlfriend, Octavia Greer, and her mother, Katie Greer, at the Greers' home. Earlier that day, Blocker stopped by the Greers' home and asked Katie[3] to do some laundry for him. Blocker returned later that evening with the victim in a maroon truck, and they sat on the porch with Katie and drank alcohol, although no one was severely intoxicated. Although Blocker and the victim appeared to have been drinking when they arrived at Katie's house, the couple was calm and sociable and did not appear to be arguing. At one point, the victim went inside the home, ostensibly to use the bathroom. Once inside, she asked Nettles and Octavia to call the police because Blocker had beaten her earlier that night and had forced her to come with him to the Greers' home. Octavia informed her mother of what the victim had told her and asked her if she should call the police. Katie, who had seen Blocker beat the victim in the past, told Octavia not to call the police because she was going to take the victim to a safe place. A short time later, Blocker came inside the house to use the bathroom. When he returned to the living room, he could tell that Katie, Octavia, Nettles, and the victim had been talking about him. Katie said that she was going to take the victim on a beer run, and Blocker replied that the victim was not going anywhere. Katie then physically placed herself between Blocker and the victim. When Katie told Blocker that the victim could stay at her house but that he had to leave, Blocker became angry and violent and began swearing at the victim. He then brandished a knife and demanded that the victim leave with him. The victim declined, and when Nettles tried to push Blocker out the door, Blocker got angry and pulled a second knife on Nettles, which resulted in Octavia going outside to call 9-1-1. As Nettles got out of Blocker's way, Katie begged Blocker to leave her property, but he refused.

After Nettles removed himself from the altercation, Blocker walked toward the victim, who dropped to the floor and began begging for her life. Blocker started punching the victim and kicking her with his work boots as she was lying on the floor.

---

[2] Although the victim's name is spelled "Leticia Boddie" in the trial transcript, we use the spelling "Laticia Bodie," as reflected in count 1 of the indictment.

[3] Because two of the witnesses share the same last name, we will sometimes refer to them by their first names for clarity. We intend no disrespect in doing so.

The victim did not try to fight Blocker. As Blocker was beating the victim, Nettles headed to the kitchen to get a stool he could throw at Blocker. Katie screamed for the victim to run, and although the victim tried to escape, she fell as she was running down the hallway. Blocker immediately jumped on the victim and stabbed her several times, saying, "[N]ow, bitch, you can go." Before he left, Blocker told Katie, "Done now, bitch." Then he calmly walked out of the house and got into the maroon truck before quickly driving away. Blocker never attacked Octavia, Katie, or Nettles during the incident and directed his anger and violence only at the victim.

Octavia, who had been on the line with the 9-1-1 dispatcher, had given the maroon truck's license plate number to the dispatcher as she was waiting for the police to arrive. This license plate belonged to a truck that had been recently reported stolen.

Although Katie attempted to administer first aid to the victim as they waited for the ambulance, the victim died from her injuries. The autopsy established that she sustained four stab wounds to her neck as well as a stab wound to her face and a cut to her right forearm. The victim bled to death from the three fatal stab wounds she received to her neck.

Blocker had acted violently toward the victim prior to the stabbing incident. On September 14, 2009, the police responded to a call and encountered the victim, who was shaking and had a laceration over her eye and bruises and swelling to her head. The victim told the officers that Blocker had hit her with a vodka bottle. She also told them she was scared of Blocker and was trying to get away from him. On November 30, 2011, the police responded to a call in which the victim said that Blocker had been standing on her porch with a gun, threatening to kill her and her current boyfriend. When the police arrived, the victim appeared scared and upset.

At around 10 a.m. on April 12, 2012, a couple of days prior to the victim's stabbing, Sergio Arellano was laying bricks at a gas station on Third Street in Memphis when he saw an African-American man get into his truck, crank it, and drive away in it without his permission. Arellano's truck was a maroon 1997 Ford F-150 with Tennessee tags that was worth approximately $3,000. Arellano contacted the police to report his truck as stolen and provided responding officers with the color, make, model, year, and either the VIN number or license tag number for his truck. The truck's description was then placed into a national database for stolen vehicles. On April 26, 2012, a truck with a VIN number matching the truck stolen from Arellano was found in Little Rock, Arkansas. Although the truck's original license plate had been replaced with another plate, the VIN number for the truck came back as the stolen truck that had been driven by Blocker when he left the scene of the stabbing.

Officers traced Blocker's Electronic Benefits Transfer card and discovered that the card had been used at a Walgreen's pharmacy in Chicago just after the stabbing, and photographs from the pharmacy confirmed that Blocker had used the card to purchase items. The card was then used in Los Angeles, where Blocker was finally detained by law enforcement on June 15, 2012.

Dr. James Walker testified as an expert in the field of forensic neuropsychology. He reviewed Blocker's school, medical, jail, police, and criminal records as well as Dr. Murray Smith's reports before interviewing Blocker and giving him a variety of tests. Dr. Walker determined that Blocker's IQ was 75, which meant that Blocker was unable to think and reason as effectively as the average person. He added that Blocker's years of alcohol and drug abuse, which permanently damaged his brain, further impaired his brain functioning.

Dr. Walker said that Blocker had told him that in the three or four days prior to the stabbing, he and the victim had been drinking, using large amounts of cocaine, and sleeping very little. As a result, Dr. Walker opined that at the time of the stabbing, Blocker was unable to make decisions effectively or to consider the consequences of his behavior. Dr. Walker also opined that Blocker would have been unable to form intent or to premeditate the victim's murder, explaining that Blocker "got very angry and he acted out impulsively, without thinking, without reasoning, in a very horrific way." Dr. Walker admitted that he did not observe Blocker on the night of the offense and did not know his alcohol level or whether Blocker had consumed any cocaine at the time he stabbed the victim. He also admitted that he did not perform a CAT scan on Blocker to determine whether there were physical signs of brain damage. Dr. Walker acknowledged that Blocker beat the victim before stabbing her several times and that he did not injure the other individuals that were present, even the ones who were trying to get him to leave the property.

Dr. Murray Smith, a specialist in internal medicine, testified as an expert in the field of addiction medicine. He consulted with Dr. Walker and reviewed Dr. Walker's reports before personally evaluating Blocker. Dr. Smith determined that Blocker suffered from the disease of addiction and that he had sustained brain damage due to his prolonged abuse of drugs and alcohol. Dr. Smith opined that Blocker was unable to premeditate or control his behavior the night of the offense in light of his brain damage, his intellectual dysfunction, and the alcohol and drugs in his system.

Dr. Smith acknowledged that he did not observe Blocker at the time of the offense and did not know how many drinks or how much cocaine he had consumed prior to the stabbing. Although he admitted that he did not perform a CAT scan on Blocker to determine if there were physical signs of brain damage, he claimed that Dr. Walker's

tests more accurately determined whether a person's brain was functioning normally. He admitted that Blocker's compromised brain function did not prevent him from asking Katie Greer to do his laundry, arming himself with knives, going over to Katie Greer's home, or deciding not to stab Nettles.

## ANALYSIS

Blocker contends that the evidence is insufficient to sustain his convictions for first degree premeditated murder and theft. The State responds that the evidence established the elements of each offense beyond a reasonable doubt. We agree with the State.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). The standard of review applied by this court in sufficiency challenges is "whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Parker, 350 S.W.3d 883, 903 (Tenn. 2011) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court shall not substitute its inferences for those drawn by the trier of fact. Id.

As to the conviction for first degree premeditated murder, Blocker argues that the State failed to prove beyond a reasonable doubt that he acted intentionally and with premeditation when he killed the victim. He asserts that he made no declarations of an intent to kill the victim, did not engage in any planning activity to kill the victim, did not procure the knife for the purpose of killing the victim, and made no effort to conceal the crime. He adds that his cognitive deficits and his use of alcohol and cocaine prior to the crime prevented him from forming the intent to kill or engaging in premeditation. Moreover, he asserts that his assault on the victim "was completed in less than a minute and without the intervening or dispassionate reflection required for premeditated murder." Blocker claims that if he formed any intent to kill the victim, it was formed in the heat of passion when he lost his temper. While recognizing that he did not have adequate provocation for voluntary manslaughter, see State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992), he asks this court to reduce his conviction to second degree murder and to remand the matter for a new sentencing hearing.

First degree murder is the premeditated and intentional killing of another person. T.C.A. § 39-13-202(a)(1). An individual acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Id. § 39-11-302(a). Premeditation is defined as "an act done after the exercise of reflection and judgment." Id. § 39-13-202(d). This section further defines premeditation:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. State v. Young, 196 S.W.3d 85, 108 (Tenn. 2006); State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000). Factors that may support the existence of premeditation include, but are not limited to, declarations by the defendant of an intent to kill, preparations before the killing for concealment of the crime, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, lack of provocation by the victim, the particular cruelty of the killing, the infliction of multiple wounds, failure to aid or assist the victim, destruction and secretion of evidence of the killing, and calmness immediately after the killing. State v. Kiser, 284 S.W.3d 227, 268 (Tenn. 2009); State v. Leach, 148 S.W.3d 42, 53-54 (Tenn. 2004); State v. Davidson, 121 S.W.3d 600, 615 (Tenn. 2003); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). In addition, a jury may infer premeditation from any planning activity by the defendant before the killing, from evidence concerning the defendant's

motive, and from proof regarding the nature of the killing. State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995) (citation omitted).

Although Blocker presented expert testimony from Dr. Walker and Dr. Smith to show that he lacked the mens rea required for first degree premeditated murder based on his intellect, brain injuries, and intoxication by alcohol and drugs, both of these experts admitted that they did not observe Blocker the night of the stabbing and did not know how much alcohol or cocaine he had consumed at the time of the offense. Dr. Walker acknowledged that Blocker beat the victim before stabbing her several times and that he did not injure the other individuals present, even those who were trying to get him to leave the home. Dr. Smith admitted that Blocker's compromised brain function did not prevent him from asking Katie Greer to do his laundry, arming himself with knives, going over to Katie Greer's home, and deciding not to stab Nettles. It was the jury's prerogative to reject the testimony provided by these experts.

The remaining proof at trial established that Blocker and the victim had an extremely tumultuous relationship. On occasions prior to the stabbing, Blocker had beaten the victim and threatened to kill her. See State v. Smith, 868 S.W.2d 561, 574 (Tenn. 1993) ("[V]iolent acts indicating the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim."). On or about April 14, 2012, Blocker armed himself with two knives before going with the victim to the Greers' home. Although Katie Greer pleaded with Blocker to leave her home that night when she realized there was a problem between Blocker and the victim, Blocker refused. Several witnesses testified that Blocker punched and kicked the victim, who was begging for her life and did not fight back. Blocker then stabbed the unarmed victim multiple times in the neck, face, and chest before saying, "[N]ow, bitch, you can go." Although Blocker drew a knife on Nettles when he tried to intervene on the victim's behalf, he did not injure anyone at the scene other than the victim. After Blocker repeatedly stabbed the victim, he remained calm and told Katie Greer as he was walking out of the house, "Done now, bitch." Blocker fled the crime scene and traveled through several states before he was ultimately detained by law enforcement in California. Given this evidence, a rational jury could have found that Blocker intentionally and with premeditation killed the victim.

Before addressing the merit of the sufficiency of the evidence of the theft conviction, we are compelled to address the somewhat unorthodox methodology of how that charge was presented to the jury. Although Blocker apparently acknowledged his guilt of the theft charge in open court outside the presence of the jurors, the record shows that the theft charge was also submitted to the jury. The trial court made the following comments regarding this issue: "I'm going to submit the issue of the guilt or innocence

of the defendant on the theft to the jury . . . [f]or their consideration unless the defendant is willing to enter into a regular guilty plea right now outside the presence of the jury." The court added, "[W]hen [a defendant] plead[s] guilty to something, I still let the jury decide whether he's guilty unless between now [and when the appropriate documents regarding the guilty plea are signed]." Later, during the motion for judgment of acquittal, defense counsel acknowledged that he had an agreement with the State that he "wasn't really going to contest [the theft charge]" and noted that he "didn't ask any questions about the truck[,]" but asserted that he did not "think there's any proof to even send it to the jury." The trial court ultimately held that the evidence was sufficient to support a guilty verdict on the theft charge when viewing it in the light most favorable to the State, "especially in light of the fact that [Blocker] pled guilty to it in open court[.]" When the State asked if defense counsel was intending to argue the insufficiency of the evidence on the theft charge to the jury in its closing argument, defense counsel replied that he would not make that argument during his closing, and the trial court said that it would allow both charges to go to the jury. Significantly, during its instructions to the jury after the close of proof, the trial court stated, "The Defendant pleads not guilty to the first count and guilty to the second count [charging him with theft]." The verdict form and the judgment of conviction show that the jury found Blocker guilty of the theft charge, and no transcript showing a plea colloquy or order regarding a guilty plea to this charge are included in the record on appeal.

We outlined the above to cautions the trial court that its decision to inform the jury of a defendant's partial or incomplete guilty plea to a charge before submitting that same charge to the jury is fraught with peril, and we discourage this practice in the future. However, because neither party raises this issue on appeal, we will not consider it further.

Blocker contends that the State failed to prove beyond a reasonable doubt that he was the individual who took Sergio Arellano's truck or that the truck recovered in Little Rock, Arkansas belonged to Arellano. Consequently, he asks this court to reverse this conviction and dismiss this count. The State provides insufficient analysis regarding this issue.[4]

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103(a). As relevant in this case, the term

---

[4] In this case, the proof of the theft, while sufficient to sustain the conviction, was not overwhelming. The State's analysis of the theft in this case was rather flippant and illogical. While the record indicates that Blocker acknowledged his guilt of the offense in open court outside the presence of the jury, the theft charge was nevertheless submitted to the jury, and the sufficiency of the evidence is raised as an issue on appeal. While we recognize the time limitations placed on all State attorneys, we urge the State to submit more thoughtful and complete work to this court in the future.

"deprive" means to "[d]ispose of property or use it or transfer any interest in it under circumstances that make its restoration unlikely[.]" Id. § 39-11-106(a)(8)(C) (Supp. 2011). Theft of property valued at $1000 or more but less than $10,000 is a Class D felony. Id. § 39-14-105(3).

Blocker claims that the State failed to establish that he was the individual who committed the theft offense. "The identity of the perpetrator is an essential element of any crime." Rice, 184 S.W.3d at 662 (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving the identity of the defendant as the perpetrator beyond a reasonable doubt. State v. Cribbs, 967 S.W.2d 773, 779 (Tenn. 1998). Identity may be established by direct evidence, circumstantial evidence, or a combination of the two. Thompson, 519 S.W.2d at 793. "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999) (citing State v. Strickland, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993)). The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. State v. Thomas, 158 S.W.3d 361, 388 (Tenn. 2005) (citing Strickland, 885 S.W.2d at 87).

Viewed in the light most favorable to the State, the evidence showed that on April 12, 2012, Sergio Arellano observed an African-American man get into his maroon 1997 F-150 truck, crank it, and drive away from the gas station without his permission. Arellano reported his truck stolen and provided officers with the color, make, model, year, and either the VIN number or the tag number for the truck. The truck's description was placed into a national database for stolen vehicles. On April 15, 2012, Octavia Greer told a 9-1-1 dispatcher that Blocker left the scene of the stabbing in a maroon truck and provided the license plate of this truck, which was found to be stolen. On April 26, 2012, a truck with a VIN number matching the truck stolen from Arellano was found in Little Rock, Arkansas. Although the truck's original license plate had been replaced with another plate, the VIN number was traced to the stolen truck that Blocker had driven when he left the scene of the stabbing. Because there was sufficient proof that Blocker was the perpetrator of the theft of Arellano's truck and that the truck recovered in Little Rock belonged to Arellano, we conclude that the evidence is also sufficient to support Blocker's theft conviction.

## CONCLUSION

We conclude that the evidence is sufficient to sustain Blocker's convictions for first degree premeditated murder and theft. The judgments of the trial court are affirmed.

_____
CAMILLE R. McMULLEN, JUDGE